1
2
3
4
5
6
7           UNITED STATES DISTRICT COURT

8           NORTHERN DISTRICT OF CALIFORNIA

9

10   RAYMOND SILVA LOPEZ,                    No. C 04-4782 MHP

11           Plaintiff,                      **MEMORANDUM & ORDER**
                                             **Re: Defendants' Motion for Summary**
12       v.                                  **Judgment**

13   JOE McGRATH; et al.,

14           Defendants.
                                      /
15

16           Plaintiff Raymond Silva Lopez ("plaintiff") filed this action on November 10, 2004 against

17   various officials of the Pelican Bay State Prison ("Pelican Bay") alleging a cause of action under the

18   Civil Rights Act, 42 U.S.C. section 1983 ("section 1983").  The gravamen of plaintiff's claim is that

19   defendants violated his rights under the Eighth Amendment by exposing him to a highly contagious

20   and painful disease.  Plaintiff has sued three sets of defendants.  The first set is "the custody

21   defendants": Correctional Officers Dixon and Cardoza; Sergeants Wood, Kays and Krenz;

22   Lieutenant Edwards and Captain Williams.  The second set is "the administrator defendants": former

23   Warden Joe McGrath, former Deputy Warden Teresa Schwartz and former Associate Warden

24   Richard Kirkland.  The final set consists only of Dr. Dwight Winslow, the Health Care Manager and

25   Chief Medical Officer of Pelican Bay during the time in question.  Defendants now move for

26   summary judgment on plaintiff's sole cause of action.  Having considered the parties' arguments and

27   submissions, and for the reasons set forth below, the court enters the following memorandum and

28   order.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  BACKGROUND

2      Plaintiff has been incarcerated at Pelican Bay since 1999.  Joint Statement of Undisputed

3  Facts ("JSUF") ¶ 11.  On January 26, 2002 plaintiff began sharing a cell with Abraham Mendoza.

4  Id. ¶ 12.  While plaintiff and Mendoza shared the cell, they shared a single toilet, sink desk and

5  chair.  Id. ¶ 13.  From January 26, 2006 to May 2, 2002, the housing unit in which plaintiff and

6  Mendoza were celled together was under "lockdown," during which time the two men were not

7  permitted to shower daily.  Id. ¶¶ 14–15.

8      On March 2, 2002 Mendoza sought medical treatment for an abscess on his side.  Pl.'s Exh.

9  22 at 1 & 20.  That day, Mendoza had the growth drained and was prescribed a fourteen-day course

10  of Ciproflaxin, an antibiotic, to be ingested daily.  Id. at 1–3, 6; JSUF ¶ 16.  Mendoza returned to his

11  cell the same day, but returned to the infirmary each day from March 3 until March 8.  Pl.'s Exh. 22

12  at 1, 4–6, 8–9, 11.  On March 8, after a culture from Mendoza's wounds had been tested, Mendoza

13  was diagnosed with Methicillin-resistant *Staphylococcus aureus* (MRSA), a strain of bacterial

14  infection that is resistant to Ciproflaxin.  Id. at 11.  Mendoza was nonetheless returned to his cell.

15  Id. at 9 & 11.  Four days later, Mendoza returned to the infirmary and received a prescription for

16  Clindamycin, another antibiotic.  Id. at 16.  The treating doctor advised Mendoza that he would need

17  to remain in the infirmary until he finished his course of antibiotics, but Mendoza refused further

18  medication on March 18.  Id. at 27, 29 & 31.  Mendoza returned to his cell that day with warm

19  compresses to apply to his wound.  Id. at 29 & 31.  Mendoza was apparently frustrated that the

20  infirmary personnel never explained what caused him to develop the boil, and recalls none of them

21  saying anything about *staph* or MRSA.  Defs.' Exh. C, Mendoza Dep., 55:14–17, 64:15–65:9.

22  Mendoza further testified that he first heard of MRSA a few months after the cell extraction.  Id. at

23  65:6–9.

24      By March 18, the Mendoza's abscess had healed to a "very small and dry" scab and had "no

25  drainage of any kind."  Defs.' Exh. E at 32.  At that time, Mendoza did not know that he had

26  experienced an MRSA infection.  Defs.' Exh. C, Mendoza Dep. at 52:23–53:1, 64:15–19.  However,

27  Mendoza told plaintiff at that time that he had a contagious disease and that the doctor had

28  prescribed daily linen changes.  Pl.'s Exh. 2, Lopez Dep. at 27:7–13, 28:6–12.  Mendoza confirms

1    that he "was guessing" he had a contagious disease and was concerned about it at the time he

2    returned to his cell.  Defs.' Exh. C, Mendoza Dep. at 56:1–2, 66:4–6.

3         From March 18 to March 20, Lopez "talked to every person who walked by his cell" asking

4    to be moved because of Mendoza's infection.  Pl.'s Exh. 2, Lopez Dep. at 30:13–31:20.  Plaintiff

5    estimates that he spoke to approximately ten people during that time, including several medical

6    technical assistants (MTAs).  Id. at 31:4–20.  The MTAs advised plaintiff that he should alert them

7    if he developed any bumps or boils.  Id.

8         On March 20, Lopez asked defendant Dixon, a Pelican Bay correctional officer, for a cell

9    change because he was afraid of contracting Mendoza's infection.  Pl.'s Exh. 23, Dixon Dep. at

10   40:9–41:3.  Dixon passed this information along to defendant Cardoza, another correctional officer,

11   along with defendant Krenz, a sergeant at Pelican Bay.  Id. at 42:3–17; 46:1–20.  According to the

12   custody defendants, cell change requests are first approved by correctional officers, then submitted

13   for approval by a supervising sergeant.  Pl.'s Exh. 16, Kays Dep. at 34:12–17; Exh. 24, Edwards

14   Dep. at 68:1–15; Exh. 25, Krenz Dep. at 63:25–64:22.  Krenz told Dixon that there was no space

15   available and that therefore they could not accommodate plaintiff's request.  Pl.'s Exh. 23, Dixon

16   Dep. at 42:25–43:7.  Plaintiff claims that this was not true, and that there were available beds.  Pl.'s

17   Exh. 13, Williams Dep. at 32:18–33:1.  Dixon did not investigate the issue further or consult

18   medical staff.  Pl.'s Exh. 23, Dixon Dep. at 47:4–15.  In addition to requesting a cell change,

19   plaintiff asked Dixon for extra linen changes as prescribed by Mendoza's treating physician, but

20   Dixon refused.  Pl.'s Exh. 2, Lopez Dep. at 50:2–10, 76:5–19.

21        Also on March 20, 2002 plaintiff and Mendoza withheld their breakfast trays because they

22   wanted to speak to a sergeant about a cell change.  JSUF ¶ 19.  Specifically, plaintiff told Dixon that

23   he wanted a cell change because Mendoza had "some kind of skin fungus."  Defs.' Exh. A, Lopez

24   Dep. at 29:25–30:2; Defs.' Exh. G, Dixon Dep. at 40:19–22.  After the two men barricaded

25   themselves in their cell using sheets, mattresses and towels and failed to comply with orders to

26   remove the barricade and surrender their trays, extraction teams removed the prisoners from the cell

27   using controlled force, pepper spray and a compulsion grenade.  JSUF ¶¶ 20–22.  Defendants Wood,

28   Kays and Edwards were present during the extraction.  Id. ¶¶ 21 & 23.  Telling those present that his

3

cellmate had a highly contagious disease, Lopez asked each of them for a cell change due to his medical concerns, though none granted his request.  Pl.'s Exh. 23, Dixon Dep. at 46:17–20, 48:4–9; Pl.'s Exh. 2, Lopez Dep. at 65:20–70:14, 78:14–79:12; Pl.'s Exh. 10 at D-02944; Pl.'s Exh. 27, Edwards RFA at Response No. 27; Pl.'s Exh. 28, Williams RFA at Response No. 27; Pl.'s Exh. 13, Williams Dep. at 68:7–10.  Mendoza experienced no further skin problems following the extraction.  Defs.' Exh. C, Mendoza Dep. at 87:24–88:1.

Following the extraction, Lopez's cell change request remained unfulfilled, and his medical concerns were not investigated by the custody defendants.  Pl.'s Exh. 24, Edwards Dep. at 112:14–22, 119:12–24, 128:8–16; Pl.'s Exh. 20, Wood Dep. at 90:22–91:3.  The cell was left "as is" after the extraction.  Defs.' Exh. H at D004169.  In March and April, plaintiff filed two inmate grievances and was ultimately transferred into a new cell with Francisco Acosta on May 2, 2002.  JSUF ¶ 26.  Acosta informed plaintiff that he had MRSA as well.  Pl.'s Exh. 2, Lopez Dep. at 87:6–23, 88:6–14.  Although Acosta had a history of MRSA infection, he did not have an infection at any time while celled with plaintiff.  Defs.' Exh. L, Acosta Dep. at 11:7–9; Defs.' Exh. A, Lopez Dep. at 88:6–20; Defs.' Exh. F, Paris Dep. at 90:11–13.

On May 10, plaintiff reported to the infirmary with two swelling lesions on his neck.  Pl.'s Exh. 1 at 115.  The lesions appeared that day, peaked in size and painfulness on May 20, and did not subside until the end of the month.  Pl.'s Exh. 2, Lopez Dep. at 92:1–6, 92:22–93:5, 96:18–24, 97:6–15, 98:15–17.  The following month, plaintiff developed a "golf-ball sized" boil underneath his chin, as well as pustules on his face and head.  Id. at 98:22–99:16, 100:20–102:14, 103:2–21.  Plaintiff reported again to the infirmary on June 11, 2002.  Pl.'s Exh. 1 at 125–126.  Ten days later, the prison doctors considered MRSA when one abscess would not heal.  Id. at 135 & 150.  Plaintiff returned to the infirmary on August 13, 2002 reporting painful, draining lesions on the back of his head, and was diagnosed with MRSA.  Id. at 164–65.  On September 23, plaintiff once again reported to the infirmary with a boil on his back, which was cut open and drained.  Id. at 186–87.  In November, plaintiff sought treatment for a leaking boil on the back of his neck, which was diagnosed as an "MRSA furuncle."  Id. at 259–60.  Plaintiff was treated with intravenous antibiotics.  Id.  On December 4, 2002 plaintiff was placed on single-cell status for one year due to a medical

condition identified as MRSA. Id. at 265. Plaintiff had no further skin problems or residual adverse effects after December 2002. Lopez Dep. at 134:18–21; Defs.' Exh. M, Jacobs Dep. at 89:13–21; Defs.' Exh. O at 2.

Plaintiff filed this action on November 10, 2004. Plaintiff's first amended complaint was filed on June 22, 2005. Defendants now move for summary judgment as to plaintiff's sole cause of action.

LEGAL STANDARD

I.      Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). Rather, "[i]f a nonmoving party bears the burden of proof at trial, he must establish each element of his claim with significant probative evidence tending to support the complaint." Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994) (internal quotations omitted). The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, Inc., 501 U.S.

496, 520 (1991); <u>Anderson</u>, 477 U.S. at 249.

The moving party may "move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof." Fed. R. Civ. P. 56(a). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).

II.    <u>Qualified Immunity</u>

Qualified immunity shields public officials from liability for civil damages so long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or the [official] could have reasonably believed that his particular conduct was lawful." <u>Romero v. Kitsap County</u>, 931 F.2d 624, 627 (9th Cir. 1991).

A court considering a claim of qualified immunity must conduct a two-step inquiry. As a threshold question, the court must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). If no constitutional right has been violated, there is no need for further analysis. <u>Id.</u> If a constitutional right has been violated, however, the court must next consider whether this right was clearly established. <u>Id.</u>; <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999).

The plaintiff bears the burden of proving the existence of a "clearly established" right at the time of the allegedly impermissible conduct. <u>LSO, Ltd. v. Stroh</u>, 205 F.3d 1146, 1157 (9th Cir. 2000); <u>Maraziti v. First Interstate Bank of Cal.</u>, 953 F.2d 520, 523 (9th Cir. 1992). If plaintiff cannot meet this burden, the inquiry ends and defendants are entitled to summary judgment. <u>See</u> <u>Saucier</u>, 533 U.S. at 202; <u>Romero</u>, 931 F.2d at 629 ("If the controlling law is not clearly established,

**United States District Court**
For the Northern District of California

a reasonable person would not be expected to know how to structure his conduct in order to avoid liability.") (internal quotation omitted).  If plaintiff can show the right was clearly established, the burden shifts to defendants to prove their actions were nonetheless reasonable.  See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1450 (9th Cir. 1995); Shoshone-Bannock Tribes v. Fish & Game Comm'n, 42 F.3d 1278, 1285 (9th Cir. 1994); Maraziti, 953 F.2d at 523. When the "essential facts are undisputed, or if no reasonable juror could find otherwise, then the question [of reasonableness] is appropriately one for the court."  See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1100 (9th Cir. 1995).

As qualified immunity provides immunity from suit and is not merely a defense to liability, it is important to "resolv[e] immunity questions at the earliest possible stage in litigation."  See Hunter v. Bryant, 502 U.S. 224, 227 (1991).  Accordingly, when "the underlying facts are undisputed, a district court must determine the issue on motion for summary judgment."  Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993); Saucier, 533 U.S. at 202 (highlighting preference for resolving immunity questions on summary judgment).

DISCUSSION

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  A prison official is deliberately indifferent "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id.  at 847. Additionally, to recover on a section 1983 claim a plaintiff must establish a causal connection between the defendants' conduct and the harm suffered.  Leer v. Murphy, 844 F.2d 628, 633–34 (9th Cir. 1988).

Defendants separately assert that plaintiff has failed to demonstrate Eighth Amendment liability (or, alternatively, the absence of qualified immunity), with respect to each of the three sets of defendants.  Plaintiff acknowledges that he has insufficient evidence to oppose summary judgment with respect to the administrator defendants, and has separately filed a motion to continue this motion for summary judgment as to those defendants pursuant to Federal Rule of Civil

7

United States District Court
For the Northern District of California

1  Procedure 56(f).  Accordingly, this order will address only Winslow and the custody defendants.

3  I.    Custody Defendants

4       A.    Substantial Risk of Serious Harm

5            1.    Whether MRSA Infection Constitutes "Serious Harm"

6       The Supreme Court has recognized that "exposure of inmates to a serious, communicable

7  disease" constitutes a substantial risk of harm for the purposes of an Eighth Amendment claim.

8  Helling v. McKinney, 509 U.S. 25, 33 (1993).  Examples of indications that a prisoner has a serious

9  need for medical treatment include "[t]he existence of an injury that a reasonable doctor or patient

10 would find important and worthy of comment or treatment; the presence of a medical condition that

11 significantly affects an individual's daily activities; or the existence of chronic and substantial pain .

12 . . ."  McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled on other grounds by

13 WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  While such a medical

14 need constitutes "serious harm," a plaintiff must additionally show that his risk of suffering such

15 harm was "substantial."

16      Courts have recognized a broad range of diseases which may form the basis for a claim of

17 deliberate indifference.  See, e.g., Helling, 509 U.S. at 35 (health problems associated with exposure

18 to second hand smoke); Shannon v. Graves, 257 F.3d 1164, 1168 (10th Cir. 2001) ("exposure to the

19 human waste of others" carrying "a significant risk of contracting infectious diseases such as

20 Hepatitis A, shigella, and others"); Johnson v. Ill. Dep't of Corr., No. Civ. 04-222-MJR, 2006 WL

21 741318, at *8 (S.D. Ill. Mar. 22, 2006) ("the denial of hygienic items" eventually causing "jock itch

22 and foot fungus"); Williams v. Manilla, No. 98 CV 5639, 2000 WL 1307769, at *5 (N.D. Ill. Sep.

23 12, 2000) ("some kind of chronic and severe rash" giving rise to "numerous open sores, bleeding,

24 and a spreading of the problem"); Jeffries v. Block, 940 F. Supp. 1509, 1513 (C.D. Cal. 1996)

25 (tuberculosis).  Additionally, the risk of contracting MRSA has been specifically identified by courts

26 as the type of condition which may form the basis of a medical indifference claim.  Kimble v.

27 Tennis, No. 4:CV-5-1871, 2006 WL 1548950, at *1 (M.D. Pa. June 5, 2006); Cunningham v.

28 Belleque, No. CV-03-1239-MO, 2006 WL 468377, at *3 (D. Or. Feb. 24, 2006).  The court

8

therefore has little trouble concluding that evidence of a serious exposure to MRSA would satisfy the first prong of a deliberate indifference claim.  The question then becomes whether plaintiff was exposed to a substantial risk of contracting the disease.

2.    Substantial Risk

Regarding the inherent risks associated with MRSA, the parties stand in sharp disagreement. According to plaintiff, MRSA is highly contagious and transmissible through ordinary physical contact.  Defs.' Exh. O at 1; Defs.' Exh. V at 2.  Defendants dispute this characterization of MRSA, claiming that it is not an easily transmissible *infection*, JSUF ¶¶ 1–4, and that the likelihood that a person who contracts MRSA will suffer an infection rather than a harmless *colonization* is "very, very, very small" and "minuscule."  Defs.' Exh. M, Jacobs Dep. at 91:20–24.  Defendants therefore contend that MRSA is generally benign and therefore exposure to the bacteria does not constitute a health risk of constitutional magnitude.

In any case, plaintiff must demonstrate that he faced a substantial risk of contracting MRSA from Mendoza after March 18, the date on which he allegedly learned of Mendoza's infection and began requesting a cell change from the custody defendants.  This issue involves two inquiries: (1) whether Mendoza was contagious when he returned to the cell on March 18, and (2) whether Mendoza's level of contagiousness constituted a "substantial risk."  This latter inquiry involves not only a consideration of how infectious Mendoza himself was, but also whether the unique circumstances of plaintiff's confinement with Mendoza exacerbated an otherwise acceptable level of contagiousness to an improper degree.

Defendants assert that Mendoza posed no risk of contagion after he returned to his cell on March 18 because his boil had scabbed over and there was "no drainage of any kind," and because Mendoza had been treated with antibiotics.  Defs.' Exh. E at 32; Defs.' Exh. O at 1; Defs.' Exh. M, Jacobs Dep. at 74:18–75:20.  The Federal Bureau of Prisons Clinical Practice Guidelines concerning the management of MRSA infections state that, "[i]n general, inmates with non-draining wounds or wound [sic] with minimal drainage, contained by a simple dressing, can be housed in general population."  Defs.' Exh. V at 10.  Defendants further point to conclusions by experts and a special

9

United States District Court
For the Northern District of California

1  master appointed by this District in a separate proceeding that isolation of prisoners such as

2  Mendoza is unnecessary.  Defs.' Exhs. CC & DD.

3      In response, plaintiff cites Mendoza's testimony that, when he returned to his cell from the

4  clinic, his wound was "fresh" and had to be cleaned by medical personnel by inserting "big Q-tips"

5  into it.  Pl.'s Exh. 3, Mendoza Dep. at 55:1–3, 7–13, 90:4–6, 61:5–8.  Defendants claim that

6  Mendoza's description of his wound as fresh and open applied when he returned from his clinic on

7  March 5, and that according to his medical chart on March 18 he had a "healed wound" that was

8  "previously positive for MRSA."  Defs.' Exh. E at 32; Pl.'s Exh. 3.  Furthermore, plaintiff's expert

9  testified that Mendoza had a contagious infection before he went to the infirmary on March 12, but

10 could not say with any certainty how contagious Mendoza was when he returned on March 18.

11 Defs.' Exh. F, Paris Dep. at 90:4–5.  Plaintiff's expert testified only that Mendoza "had the potential

12 for transmitting the infection," but could not "say what the degree of infectiousness was with any

13 certainty."  Id. at 90:4–6.  Plaintiff's expert further testified that he could not say what the

14 contagious period is for MRSA infection, "because there is no literature that tells us exactly what is

15 a contagious period."  Pl.'s Exh. 7, Paris Dep. at 134:18–32.  Defendants therefore assert that

16 Mendoza's six-day antibiotic treatment, truncated though it was, eliminated the bacterial presence

17 because Mendoza had no further skin problems after he returned to the cell.  Defs.' Exh. C,

18 Mendoza Dep. at 87:24–88:1.  Furthermore, although plaintiff's expert report states that "by 2002 it

19 was generally recognized that inmates who refuse treatment for MRSA without completing the

20 prescribed therapy should be isolated until it can be determined that they are no longer infectious,"

21 Pl.'s Exh. 18 at 7, this assertion does not necessarily indicate that Mendoza was contagious when he

22 returned from the infirmary without completing his course of antibiotics.  This indicates only that

23 Mendoza's infectiousness was indeterminate when he left the infirmary, not that Mendoza was

24 infectious to any degree constituting a substantial risk.  The fact that Mendoza had no further skin

25 problems after returning from the infirmary strongly corroborates defendants' argument that the

26 abbreviated drug treatment eliminated Mendoza's infection.

27      As further evidence of Mendoza's contagiousness, plaintiff testified that Mendoza's wound

28 was not always covered with a bandage when he was in the cell.  Pl.'s Exh. 2, Lopez Dep. at

10

United States District Court
For the Northern District of California

82:17–19.  As defendants point out, however, plaintiff has no basis for making this determination. When asked whether Mendoza's wound always had a bandage on it after Mendoza returned from the infirmary, plaintiff responded: "No.  I don't believe so.  Because I never seen him clean—you know, clean it or nothing, so I never seen him put another one on or nothing."  Id.  Mendoza himself testified that he went for dressing changes "once a day."  Pl.'s Exh. 3, Mendoza Dep. at 61:9–13. This is consistent with plaintiff's recollection of never having seen *Mendoza* change the bandage, though it remains undisputed that Mendoza had the medical staff change his bandage daily. Furthermore, even if Mendoza was remiss in keeping his wound covered or cleaned, there is nothing in the record indicating that this specific hygienic deficiency was brought to the attention of any of the defendants.

Turning to the effects of close confinement, plaintiff further claims that the contagiousness of Mendoza's infection was exacerbated by the specific circumstances under which plaintiff was exposed.  Because any surface "touched by an individual who has MRSA that has not washed their hands . . . is a potential contaminant," Pl.'s Exh. 29, Jones Dep. at 105:10–20, the fact that plaintiff shared a small cell with a single toilet, sink, desk and chair with Mendoza enhanced his risk of infection.

In addition to these inherent risks associated with sharing a cell with a possibly contagious individual, plaintiff claims that numerous failures on the part of the custody defendants further increased plaintiff's risk of infection.  Plaintiff states that there is no evidence that his cell was cleaned and disinfected after Mendoza was diagnosed.  See Pl.'s Exh. 18 at 6.  Plaintiff further claims that the two men were given insufficient changes of linen or laundry, even after Mendoza's doctor ordered linen changes.  Pl.'s Exh. 3, Mendoza Dep. at 66:15–18; Pl.'s Exh. 2, Lopez Dep. at 28:4–7, 50:1–10; Pl.'s Exh. 26.  Plaintiff also claims he and Mendoza were allowed to shower less frequently than usual, despite the fact that increased showers were a recognized precaution in 2002. Pl.'s Exh. 18 at 7; Pl.'s Exh. 16, Kays Dep. at 28:14–29; Pl.'s Exh. 25, Krenz Dep. at 45:1–7; Pl.'s Exh. 2. Lopez Dep. at 23:14–20.  Plaintiff testified that he showered every other day, and on other days gave himself a "bird bath" in his cell.  Id.  Finally, plaintiff claims that he was not given antibacterial soap, and often ran out of his own soap without being given a fresh supply, causing him

United States District Court
For the Northern District of California

to share Mendoza's soap.  Pl.'s Exh. 2, Lopez Dep. at 21:10–23; Pl.'s Exh. 3, Mendoza Dep. at 35:3–5, 35:25–36:7.  This conflicts with the recognized precaution of "the provision of individual antibacterial soap bars to inmates together with instructions on never sharing these items."  Pl.'s Exh. 18 at 7.  However, Dixon testified that he had "no idea" whether inmates were given antibacterial soap, and Infection Control Nurse Lila Evans-Johnson testified that antibacterial soap is detrimental to the management of MRSA within the prison because it fosters the development of resistant strains of bacteria.  Pl.'s Exh. 23, Dixon Dep. at 35:2–5; Pl.'s Exh. 8, Evans-Johnson Dep. at 66:15–16.

Regarding these hygienic concerns, defendants point to testimony from plaintiff stating that he never had difficulty keeping himself clean or keeping his cell clean while he was celled with Mendoza.  Pl.'s Exh. 2, Lopez Dep. at 21:5–9.  Additionally, Mendoza testified that he and Lopez were able to clean their cell once a week with Borax.  Pl.'s Exh. 3, Mendoza Dep. at 36:22–37:5.  Additionally, defendants' expert, Dr. Jacobs, testified that surface decontamination is not recommended for MRSA-infected patients in the community because the risk of contracting MRSA from surfaces is "very low."  Defs.' Exh. M, Jacobs Dep. at 39:19–25.

Although it seems relatively uncontested that these additional hygienic measures would have reduced any risk of infection that may have existed, plaintiff has provided no evidence that such measures were necessary to reduce the particular risk to which plaintiff was exposed to a constitutionally permissible level.  Indeed, the fact that plaintiff's expert could not opine on the degree of Mendoza's infectiousness with any certainty all but mandates summary judgment in favor of all defendants.  If plaintiff is unable to submit evidence that he was exposed to any particular degree of risk, he certainly cannot demonstrate that he was exposed to a "substantial risk" as required for a deliberate indifference claim.  Accordingly, plaintiff has failed to produce significant probative evidence of exposure to a substantial risk of harm.  Because plaintiff has failed to satisfy this threshold requirement, summary judgment in favor of all defendants is warranted.

Although the court finds that summary judgment is justified based on a failure to demonstrate substantial risk of harm, the court will address the remaining issues briefed by the parties.

12

B.   Knowledge

To prevail on a deliberate indifference claim, "the plaintiff must establish that the defendant knew of and disregarded an excessive risk to the plaintiff's health and safety (i.e., the defendant was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and the defendant drew the inference)." Palacios v. City of Oakland, 970 F. Supp. 732, 741–42 (N.D. Cal. 1997) (Illston, J.) (citing Farmer, 511 U.S. at 837). The question of knowledge of a substantial risk is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842 (citation omitted). However, "using circumstantial evidence to prove deliberate indifference requires more than evidence that the defendants *should* have recognized the excessive risk and responded to it; it requires evidence that the defendant *must* have recognized the excessive risk and ignored it." Beers-Capitol v. Whetzel, 256 F.3d 120, 138 (3d Cir. 2001).

Regardless of the nature and severity of plaintiff's risk of infection, defendants claim that the custody defendants did not know of the risk, and therefore liability cannot attach. Farmer, 511 U.S. at 844 (holding that "prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment"). Defendants dispute plaintiff's testimony that he told some of the custody defendants that his cellmate had MRSA, Defs.' Exh. A, Lopez Dep. at 94:22–95:4, citing Mendoza's testimony that he did not learn that he had MRSA until "way after" he was no longer celled with plaintiff and that he never spoke to Lopez about MRSA. Defs.' Exh. C, Mendoza Dep. at 65:13–15, 91:17–92:5. For the purposes of summary judgment, however, the court cannot make credibility determinations and therefore must accept plaintiff's testimony as true.

In addition to his own testimony, plaintiff identifies a number of admissions on the part of the custody defendants indicating that they were aware of plaintiff's concern that he would contract a skin infection from Mendoza. Edwards and Williams each admitted that plaintiff complained or voiced concerns to them about contracting MRSA from Mendoza. Pl.'s Exh. 27 at Response No. 27; Pl.'s Exh. 28 at Response No. 27. Dixon testified that he was aware that plaintiff wanted a cell change "to get away from his cellmate because he said that his cellmate had some kind of skin

13

United States District Court
For the Northern District of California

fungus." Pl.'s Exh. 23, Dixon Dep. at 40:19–22. Dixon then communicated this information to Krenz, Cardoza, Keys and Wood, though it appears that Dixon first informed Keys and Wood of plaintiff's medical concerns when Kays and Wood arrived during the extraction. Id. at 42:5–17, 46:1–11, 50:19–24, 51:22–27. The record also indicates that Dixon was aware of plaintiff's requests for linen changes related to medical concerns. Id. at 48:20–22, 49:16–18.

Plaintiff has cited evidence indicating that the custody defendants knew that plaintiff faced the risk of exposure to an infectious disease, and possibly that plaintiff was exposed specifically to MRSA. Furthermore, even if the custody defendants did not realize the specific disease that plaintiff was exposed to, the mere fact that defendants were aware that plaintiff was significantly concerned with contracting some form of serious skin infection—concerned enough not only to repeatedly request help but to subject himself to a cell extraction when his requests went unanswered—is sufficient for liability to attach in light of the breadth of diseases which courts consider to be substantial risks.

Finally, defendants claim that the custody defendants properly relied on the medical staff regarding the handling of medical issues, and therefore could not have known that the risk was substantial enough to warrant additional action on their part. Defs.' Exh. N, Kays Dep. at 54:15–25. In particular, the medical staff determined that it was proper for Mendoza to return to his cell, plaintiff was consulting with the medical staff after Mendoza returned to the cell, and medical personnel were present during the extraction and evaluated plaintiff and Mendoza afterwards. Defs.' Exh. A, Lopez :Dep. at 79:13–80:22; Defs.' Exh. K at 309–10; Defs.' Exh. E at 29 & 32. Plaintiff testified during his Rules Violation Hearing that the medical staff knew about Mendoza's condition but "didn't tell anyone." Defs.' Exh. W at 2. Certain of the custody defendants also specifically testified as to their reliance on the medical staff. Williams stated that the medical staff advised him that Mendoza was not contagious, Defs.' Exh. EE, Williams Dep. at 51:2–13, and Edwards testified that if Mendoza had been contagious the medical staff would not have released him into the general population. Defs.' Exh. I, Edwards Dep. at 141:22–142:2.

"If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands," and therefore prison

14

officials cannot be considered deliberately indifferent "simply because they failed to respond

directly to the medical complaints of a prisoner who was already being treated by a prison doctor."

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  Plaintiff argues that the custody defendants

cannot claim that they reasonably relied on the medical staff in light of the general knowledge

among the custody staff that the medical staff was not appropriately addressing the threat of MRSA

infection.  In support of this argument plaintiff cites a union grievance filed in June 2002 which

states:

> On February 28, 02, the local chapter . . . reached an agreement with the CMO M.D. Winslow concerning PBSP's obligation to staff and inmates in combating the spread of MRSA.  [. . .]  *It was agreed inmates diagnosed with MRSA will be placed in the infirmary until medically evaluated and it is determined the inmate is no longer contagious.*
>
> It has become apparent that this agreement is not being adhered-to, because physicians are sending diagnosed MRSA contagious inmates back to the inmate [general population] . . . . We . . . have what we believe to be evidence of inmates not infected with MRSA being housed with known (by CDC) infected inmates who in turn became infected.

Pl.'s Exh.34 at D004016 (emphasis in original).  This grievance, according to plaintiff,

"conclusively undermines" the custody defendants' purported reliance on the medical staff, or at

least creates a triable issue of fact.

Even assuming that the facts set forth in this grievance were true, it does not render the

custody defendants' reliance upon medical staff unreasonable.  Significantly, the grievance was not

filed by any of the custody defendants, and there is no evidence that the custody defendants were

aware of the allegations set forth therein.  The grievance therefore has no bearing on the custody

defendants' alleged knowledge that Mendoza posed a risk of infection.

Drawing all inferences in favor of plaintiff, however, plaintiff has raised a triable issue of

fact as to whether the custody defendants were aware of a substantial risk based on their interactions

with plaintiff.  The reasonableness of these defendants' reliance on the medical staff, however, is

relevant to qualified immunity, as discussed below.


C.    Causation

15

United States District Court
For the Northern District of California

1    As a final element to a deliberate indifference claim, a plaintiff must show that the

2    defendant's indifference "was the actual and proximate cause of the deprivation of the inmate['s]

3    eighth amendment right to be free from cruel and unusual punishment." Williams v. Ross, No. C

4    04-2409 SI, 2007 WL 108468, at *2 (N.D. Cal. Jan. 10, 2007) (Illston, J.) (emphasis removed)

5    (quoting Leer, 844 F.2d at 633–34). "However, a finding that the defendant's activities resulted in

6    'substantial' harm to the prisoner is not necessary . . . ." McGuckin, 974 F.2d at 1060. Here, the

7    issue is whether defendants' conduct was the actual and proximate cause of plaintiff's MRSA

8    infection.

9    Defendants claim that plaintiff cannot establish how or when he contracted the infection at

10   issue in this case, and further claim that the record indicates that plaintiff contracted MRSA before

11   March 18. In support of their suggestion that plaintiff did not contract MRSA from Mendoza,

12   defendants make three contentions.

13   First, defendants claim that plaintiff had contracted MRSA before his mid-March

14   confinement with Mendoza. On March 19, plaintiff presented with an infected hair follicle that had

15   been present for about two weeks. Defs.' Exh. K at 314; Defs.' Exh. M, Jacobs Dep. at

16   56:10–57:16, 94:1–17. Defendants claim that because testing in June confirmed that plaintiff had

17   MRSA, and because MRSA infections have a propensity to recur, this evidence indicates that the

18   folliculitis present at the beginning of March was the result of an MRSA infection. Defs.' Exh. M,

19   Jacobs Dep. at 56:20–57:11. As Jacobs explained, "it was a folliculitis, which is an inflammation of

20   hair follicles, which is caused by staph aureus. And in view of his subsequent history, I think that it

21   was more likely than not that it was MRSA." Id. at 94:8–17; Defs.' Exh. F, Paris Dep. at 77:6–7. In

22   light of this, Jacobs testified that plaintiff "almost certainly" had MRSA by early March based on the

23   folliculitis. Defs.' Exh. M, Jacobs Dep. at 56:20–57:11, 94:1–17. Plaintiff responds that his chart

24   indicates that MRSA was ruled out as the cause of this inflammation. Pl.'s Exh. 1 at 89, JSUF ¶ 18.

25   Defendants, in turn, point to evidence that the notation in plaintiff's chart ruled out MRSA only

26   prospectively, not affirmatively, and that the medical staff ordered additional testing to determine

27   whether the inflammation was caused by an MRSA infection. Pl.'s Exh. 6, Jacobs Dep. at

28   57:17–19; Pl.'s Exh. 18 at 9. Furthermore, defendants claim that plaintiff has shown no evidence

16

1   that he did not contract MRSA during the period between March 2 through 18, before the time at

2   which the custody defendants were allegedly deliberately indifferent.

3   　　　　Second, defendants claim that plaintiff's expert admitted that he could not say when plaintiff

4   became colonized with MRSA.  Defs.' Exh. F, Paris Dep. at 129:14–18.  Plaintiff responds that it

5   was extremely unlikely that he was colonized with MRSA before celling with Mendoza, as less than

6   1% of all individuals—and less than 0.4% of all Latinos—are colonized with MRSA.  Plaintiff's

7   expert, however, testified that 5% of all incarcerated persons are MRSA-colonized based on

8   published measurements by the Center for Disease Control.  Defs.' Exh. F, Paris Dep. at 10:8–10.

9   　　　　Finally, in addition to being unable to state *when* plaintiff contracted MRSA, plaintiff's

10  expert stated that he did not know *how* plaintiff became infected.  In particular, plaintiff's expert

11  could not say whether exposure to Mendoza caused plaintiff's infection.  Defs.' Exh. F, Paris Dep. at

12  133:21–22.  Further, defendants claim that plaintiff may have had MRSA infection as early as 1998.

13  In 1998, plaintiff reported having an insect bite, Defs.' Exh. K at P00530; Defs.' Exh. M, Jacobs

14  Dep. at 56:9–18, and plaintiff's expert explained that it is "well-known by physicians that the so-

15  called insect bites in the prison, the vast majority are abscesses due to other reasons, one of them

16  being MRSA."  Defs.' Exh. F, Paris Dep. at 81:22–25.  Plaintiff's expert report additionally states

17  that plaintiff contracted MRSA from either Mendoza or Acosta, but does not state which inmate was

18  more likely to have been the source of plaintiff's infection.  Pl.'s Exh. 18 at 9–10.  As plaintiff does

19  not appear to assert deliberate indifference with respect to his being confined with Acosta,

20  defendants claim that this uncertainty eliminates plaintiff's ability to show the requisite causation.

21  　　　　At best, defendants' alternative theories of how plaintiff became infected with MRSA create

22  a triable issue of fact as to how plaintiff acquired the disease.  Plaintiff developed symptoms of

23  MRSA within weeks of sharing a cell with an MRSA-infected inmate, under "lockdown" conditions,

24  with arguably insufficient sanitation.  Assuming that Mendoza was infectious, it would not be

25  unreasonable for a jury to conclude that plaintiff became infected with MRSA as a result of sharing

26  the cell with Mendoza.  However, as discussed above, plaintiff has not presented significant

27  probative evidence that Mendoza was infectious at all.

28  　　　　Further, plaintiff has identified acts or omissions on the part of each of the custody

17

United States District Court
For the Northern District of California

1   defendants that caused him to be exposed to Mendoza's disease. The custody defendants refused

2   plaintiffs' cell transfer request and failed to provide clean linens and laundry, adequate soap or a

3   clean cell. Although the various custody defendants learned of plaintiff's medical concerns at

4   different times, each of them was aware, both of plaintiff's concerns and his desperation, at the time

5   of the cell extraction on March 20. Plaintiff was not moved to a new cell until several weeks later,

6   and only after he had filed two inmate grievances.

7         However, plaintiff has not shown that any single custody defendant could have unilaterally

8   caused plaintiff to be moved to a different cell. Rather, the record shows that a cell transfer process

9   involved decisions by multiple individuals. This constitutes a significant evidentiary void regarding

10   causation, specifically related to the requirement that defendant establish "individual fault." <u>Leer</u>,

11   844 F.2d at 633–34 (holding that "[i]n order to resolve this causation issue, [the court] must take a

12   very individualized approach which accounts for the duties, discretion, and means of each

13   defendant"). In addition to the inadequacy of plaintiff's evidence regarding a substantial risk of

14   harm, plaintiff's lack of evidence regarding individual fault further supports a grant of summary

15   judgment in favor of the custody defendants.

16

17   II.    <u>Dr. Winslow</u>

18         Plaintiff asserts that Winslow is liable in his supervisory capacity based upon his failure to

19   adopt and implement effective policies and practices to prevent MRSA infection. Winslow's

20   allegedly flawed policies, plaintiff argues, amounted to "setting in motion a series of acts by others

21   which the actor knows or reasonably should know would cause others to inflict the constitutional

22   injury," which may constitute deliberate indifference. <u>Redman v. County of San Diego</u>, 942 F.2d

23   1435, 1447 (9th Cir. 1991) (en banc) (internal quotations omitted); <u>see also</u> <u>Marcotte v. Monroe</u>

24   <u>Corr. Complex</u>, 394 F. Supp. 2d 1289, 1297 (W.D. Wash. 2005) (holding that "supervisory liability

25   exists if the official implements a policy so deficient that the policy itself is a repudiation of

26   constitutional rights and is the moving force behind the constitutional violation"). Defendants assert

27   that plaintiff has failed to create a triable issue of fact as to each of the required elements of a

28   deliberate indifference claim against Winslow in his role as the prison's Chief Medical Officer.

**United States District Court**
For the Northern District of California

A.    <u>Substantial Risk of Serious Harm</u>

The parties dispute the proper characterization of the "substantial risk" at issue with respect to Winslow.  Defendants claim that the inquiry should focus on whether the policies and procedures in place at the time of plaintiff's exposure to Mendoza created a substantial risk of harm.  Plaintiff asserts that he need only show that MRSA itself presented an unreasonable risk to the health of the inmates at Pelican Bay in order to satisfy the first prong of an Eighth Amendment claim against Winslow.

Plaintiff's proposed formulation misses the distinction between "serious harm" and "substantial risk."  To be sure, an MRSA infection constitutes "serious harm."  But the mere existence of MRSA in the abstract does not satisfy the "substantial risk" prong unless the "risk" of becoming infected is "substantial."  In any case, plaintiff's disagreement with defendant's formulation is a distinction without a difference.  Even if MRSA infection itself is the "substantial risk," Winslow would be absolved of liability if his policies and procedures effectively abated that risk.  <u>Farmer</u>, 511 U.S. at 847. Accordingly, the ultimate question boils down to whether the policies and practices in place at Pelican Bay under Winslow's watch at the time in question created an unacceptable risk of MRSA infection.

Defendants claim that the infection-prevention measures in place prior to mid-March 2002 did not pose a substantial risk of serious harm, for a number of reasons.  First, defendants point to the fact that between March 2001 and March 29, 2002, Pelican Bay had only fourteen MRSA infections among the 3,500–3,900 inmates it housed at any given time.  Defs.' Exh. T; Defs.' Exh. U, Evans-Johnson Dep. at 90:15–93:14.  Plaintiff's expert, in contrast, had seventy-three MRSA infections in less than one year among 1,500 inmates at the prison he medically supervised.  Defs.' Exh. X; Defs.' Exh. F, Paris Dep, at 189:24–190:5.  Plaintiff disputes the reliability of the Pelican Bay figures, stating that the purportedly low number of MRSA infections at Pelican Bay was drawn from a flawed and incomplete investigation by Evans-Johnson.  Evans-Johnson apparently did not visit any clinic to directly check its records, instead relying on voluntary submissions of MRSA information from other clinics in the prison.  Pl.'s Exh. 8, Evans-Johnson Dep. at 103:5–20.  Furthermore, Evans-Johnson's investigation focused only on cases with records of positive MRSA

United States District Court
For the Northern District of California

1    cultures.  Id. at 91:15–92:4.  Because cultures were only taken on four of plaintiff's eight outbreaks,

2    plaintiff argues, Evans-Johnson's report likely understates the actual number of MRSA infections

3    within the prison.  Defendants counter that, even if the report did not detect every MRSA case,

4    plaintiff has nonetheless failed to show a statistically significant number of MRSA infections, or that

5    Evans-Johnson's methods were so flawed as to render her findings unreliable.[1]

6

7         B.    Knowledge

8         Similarly, defendants claim that Winslow had no knowledge of any substantial risks

9    associated with the policies and procedures, because there was no risk to know about.  Defendants

10   further allege that the small number of MRSA infections indicated to Winslow that the policies and

11   practices did not pose a substantial risk of MRSA infection.

12        Turning to what Winslow actually did know regarding MRSA and its associated risks,

13   Winslow understood that Pelican Bay was subject to some risk of MRSA outbreak in 2000, by

14   which point a number of inmates at the prison had been diagnosed with MRSA.  Pl.'s Exh. 12 at

15   Response No. 3; Pl.'s Exh. 5, Winslow Dep. at 128:9–15.  It is unclear how many cases of MRSA

16   developed during this time, however.  Id.  Plaintiff also asserts that Winslow understood that

17   policies addressing treatment of MRSA-infected inmates and the prevention of transmission were

18   necessary as early as 1997.  Pl.'s Exh. 18 at 2, 5 & 6; Pl.'s Exh. 5, Winslow Dep. at 124:5–15; Pl.'s

19   Exh. 8, Evans-Johnson Dep. at 22:18–23:12.  Additionally, Winslow understood that MRSA was

20   "spread mainly by hands through physical contact with the inmate or by touching surfaces and

21   supplies in the inmate's living area or house that are contaminated with MRSA," that the risk of

22   MRSA transmission would be reduced by isolating infected inmates, and that "standard precautions"

23   were in some cases inadequately communicated to custodial staff and inmates and therefore were not

24   being followed.  Pl.'s Exh. 5, Winslow Dep. at 98:19–100:7, 145:4–12, 269:18–271:20.  Winslow

25   indicated that, when it was brought to his attention that the instructions were not being implemented,

26   he would provide additional training to the problematic staff members.  Id. at 269:18–271:20.

27        As a medical professional, Winslow almost certainly understood the nature of MRSA

28   infection and its associated risks.  The question remains, however, as to whether Winslow's policies

**United States District Court**
For the Northern District of California

1   and practices at the time of plaintiff's exposure were a reasonable and effective response to the

2   known risks associated with the disease.  In other words, if the policies and practices were sufficient,

3   or if Winslow had no knowledge that his policies and practices were deficient, liability cannot

4   attach.

5

6          C.      Deliberate Indifference

7          Defendants assert that Winslow cannot be found to have been deliberately indifferent

8   because his conduct was reasonable.  Farmer, 511 U.S. at 845 ("Whether one puts it in terms of duty

9   or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel

10  and Unusual Punishments Clause.").  A consideration of Winslow's reasonableness in the context of

11  Pelican Bay's general policies and procedures related to MRSA requires a review of the history of

12  MRSA concerns within the prison.

13         In early 2002, custody staff and some medical staff became extremely concerned about

14  MRSA.  Defs.' Exh. U, Evans-Johnson Dep. at 62:6–13; Defs.' Exh. N, Kays Dep. at 49:15–17,

15  52:19–25.  One representative of the correctional officers' union filed a grievance in February 2002

16  in which he stated that MRSA "is highly infectious and demands quarantine of all inmates effected

17  [sic] now!".  Defs.' Exh. Y.  In response to these concerns, Winslow had Evans-Johnson distribute a

18  memorandum to custody staff to ensure appropriate staff education related to MRSA.  Defs.' Exh.

19  U, Evans-Johnson Dep. at 61:10–62:13, 105:16–106:6.  In addition to this memorandum, Winslow

20  instructed Evans-Johnson along with a Public Health Nurse to provide *staph*-prevention education

21  directly to over 150 members of the medical and custody staff in February 2002.  Defs.' Exh. FF.

22  An additional memo clarifying what MRSA was and setting forth prevention measures was

23  disseminated that same month to "all health care staff."  Defs.' Exh. GG.[2]  Winslow, meanwhile,

24  worked with Evans-Johnson to confirm the appropriateness of the MRSA-prevention policy after the

25  February 2002 memoranda were issued.  Defs.' Exh. S, Winslow Dep. at 64:19–24.  Evans-Johnson

26  consulted with the Sacramento Public Health Office, the CDC Public Health Division, other

27  Northern California infection control nurses and the Center for Disease Control in Atlanta to ensure

28  that the policies were appropriate.  Defs.' Exh. U, Evans-Johnson Dep. at 28:8–29:6.  Finally,

United States District Court
For the Northern District of California

1    Winslow had certain members of the medical staff undergo additional training to ensure that prison

2    physicians were implementing the policy, and had frequent meetings with the physicians.  Defs.'

3    Exh. S, Winslow Dep. at 269:3–270:21.  Winslow implemented an updated Infection Control Policy

4    & Procedure in April 2002, and distributed another memorandum in July 2002 to all healthcare staff

5    to further refine the guidelines.  Defs.' Exhs. AA & BB.  Defendants assert that this course of

6    conduct indicates that Winslow's response to any threat of MRSA infection was reasonable as a

7    matter of law and bars liability.

8         Plaintiff apparently acknowledges that these steps were taken, but essentially argues that

9    they were both too little and too late.  Specifically, although Winslow knew that inmates had been

10   diagnosed with MRSA infection in 2000 and may have understood that Pelican Bay was at risk of

11   widespread infection as early as 1997, Winslow did not meaningfully respond to the MRSA issue

12   until early 2002, after the prison had been subject to MRSA outbreaks and after prison staff had

13   become concerned.  Plaintiff further asserts that Winslow did not draft an adequate formal policy

14   until late July 2002, and did not finalize the policies until 2004.  Pl.'s Exh. 36 at AG0059–63 & 68.

15        By "adequate" plaintiff apparently means a policy that would have required staff to respond

16   to Mr. Lopez's requests in March 2002.  Plaintiff therefore claims that the memorandum circulated

17   in February 2002 was inadequate and placed plaintiff at a heightened risk of contracting MRSA.

18   Plaintiff identifies five precautions which the February 2002 memorandum does not provide for, but

19   which plaintiff alleges were necessary to adequately defend against the threat of MRSA infection:

20   (1) thorough cleaning and disinfecting of an inmate's cell when he is diagnosed with MRSA; (2)

21   allowing more frequent showers to inmates diagnosed with MRSA and their cellmates; (3) providing

22   more frequent laundry and linen changes to MRSA-infected inmates and their cellmates; (4)

23   providing inmates sufficient soap, preferably antibacterial soap; and (5) ensuring that the water

24   temperature of prison washing machines is high enough to kill MRSA bacteria.  Pl.'s Exh. 5,

25   Winslow Dep. at 165; Pl.'s Exh. 18 at 6–7 (stating that failure to implement these procedures was

26   inadequate in light of the knowledge regarding MRSA infections at the time); Pl.'s Exh. 8, Evans-

27   Johnson Dep. at 67:21–68:3; Pl.'s Exh. 36 at AG0059–63.  With regard to disinfecting a cell that

28   had been occupied by an inmate with a draining wound, however, Jacobs testified that "[y]ou might

22

want to do that," that it "would be an ideal thing to do," and that it "might help reduce the risk" of transmission, but that "[i]t's never been shown that it does," Pl.'s Exh. 6, Jacobs Dep. at 41:13–25.

Additionally, plaintiff asserts that, regardless of whether the February 2002 memorandum was facially effective, Winslow failed to properly implement its requirements. Plaintiff cites two employee grievances filed in June 2002, after the February 2002 memorandum had been distributed. On June 11, 2002, a grievance was filed alleging that "medical management is now playing hide the Bacterial Infection." Pl.'s Exh. 35 at D004022. Plaintiff additionally cites a similar grievance filed the following day, discussed *supra* in section I.B, complaining that contagious, MRSA-infected inmates were being released into the general population. Pl.'s Exh.34 at D004016. Finally, an Employee Grievance Response dated August 19, 2002 states that "In the future, all inmates with positive MRSA cultures will be housed in the CTC [infirmary]. In addition those who are suspected of having MRSA and have a mature boil will also be housed in the CTC." Pl.'s Exh. 40.

Plaintiff contends that these institutional failures were borne out in the manner in which the medical staff handled Mendoza—failing to culture his abscess until three days after his first visit to the infirmary, returning him to his shared cell with a draining wound, and failing to admit him to the infirmary or isolate him until four days after lab results confirmed that he was infected with MRSA. Pl.'s Exh. 22 at MEN-00005, 00009–11 & 16. Defendants respond that these union grievances fail to create a genuine issue of fact as to the propriety of the systems in place because the action requested by the union—quarantining inmates such as Mendoza—was medically unnecessary. Defs.' Exh. V at 10 (stating that "inmates with non-draining wounds or wound [sic] with minimal drainage, contained by a simple dressing, can be housed in general population"); Defs.' Exhs. CC & DD.

Finally, defendants assert that Winslow did not have the authority to create official policies, only to implement them. Evans-Johnson testified that MRSA policies required the involvement of "Sacramento" and "had to be approved by Hagar," the special master appointed by the Northern District of California. Pl.'s Exh. 8, Evans-Johnson Dep. at 29:19–25. The special master to which Evans-Johnson was referring had previously made it clear that a remedial plan that had been in place as the result of a federal court order "takes priority over other agreements" regarding the placement

of MRSA-infected inmates. Defs.' Exh. Z at 8:15–19. Accordingly, defendants assert that Winslow

cannot be held liable for a failure to perform a duty he had no authority to perform.

D.    Causation

Defendants claim that Winslow cannot be found to have caused plaintiff's MRSA infection

because (1) plaintiff could have contracted MRSA prior to being celled with Mendoza and (2)

plaintiff's expert could not say that plaintiff became colonized due to the conduct of any particular

person or persons, stating that he could only "speculate" as to "who's at fault." Defs.' Exh. F, Paris

Dep. at 97:10–14. Mere speculation does not create a factual dispute sufficient to withstand

summary judgment. Toguchi v. Chung, 391 F.3d 1051, 1059 (9th Cir. 2004). Although plaintiff's

expert was unable to place the sole blame on a single individual, however, the expert's full

testimony indicates that he placed the blame on a broader institutional failure within Pelican Bay

involving both custodial and medical personnel:

> Q. And when you say the Pelican Bay health authorities, are you
> saying that as separate and distinct from the Pelican Bay custody and
> security authorities?
> A. Not completely. Because some of the actions of the health
> authority consisted of giving direction to custody to perform certain
> actions, such as showering, linen changes, disinfection of surfaces.
> And I'm not going to speculate who's at fault.
>     All I look at is the totality of what was done, and conclude that
> certain preventative actions which are inspired by health authorities
> that may require custody to do certain things were not done.

Defs.' Exh. F, Paris Dep. at 97:6–18. In sum, plaintiff's theory is that deliberate indifference at

several levels and on the part of numerous individuals caused him to become infected with MRSA.

To the extent that being celled with Mendoza constituted an unreasonable risk of MRSA infection,

was the result of policies and practices overseen by Winslow, and proximately caused plaintiff's

illness, plaintiff has raised a triable issue of fact as to Winslow's liability. However, because

plaintiff has failed to produce significant probative evidence that being celled with Mendoza

constituted an unreasonable risk of harm, summary judgment is appropriate as to Winslow's

liability.

United States District Court
For the Northern District of California

1    III.    Qualified Immunity

2            Regardless of whether plaintiff has raised sufficient evidence to demonstrate a constitutional

3    violation, the court finds that Winslow and the custody defendants are entitled to qualified

4    immunity.  Although the right to be free from unreasonable exposure to infectious disease is "clearly

5    established,"[3] plaintiff has not shown that defendants were "plainly incompetent" or that they

6    "knowingly violate[d] the law."  Malley, 475 U.S. at 341.

7            Regarding the custody defendants, they were reasonable in believing that Mendoza did not

8    pose a risk to plaintiff based on the fact that the medical staff released him into the general

9    population.  Although the custody defendants were required to independently assess the risk to a

10   certain degree, it was not unreasonable to assume that plaintiff's risk was acceptable in light of the

11   fact that Mendoza had been returned to his cell.  In other words, plaintiff did not have a clearly

12   established right to have the custody defendants go above and beyond what the medical staff deemed

13   appropriate in terms of addressing a putative risk of infection.

14           Furthermore, the record indicates that Winslow's response to the MRSA issue at the time of

15   plaintiff's exposure to Mendoza was reasonable.  Beginning in early 2002 Winslow worked

16   diligently with the medical staff and custodial staff to ensure that prison officials were properly

17   educated regarding MRSA.  When it appeared that officials were not complying with the applicable

18   policies, Winslow provided additional training, often meeting personally with physicians.  While the

19   policies and practices in place at the time of plaintiff's exposure might not have been ideal, it is not

20   clear that they were so deficient as to give rise to a constitutional violation, let alone fall short of the

21   standard of competence required for qualified immunity to attach.

22           Accordingly, Winslow and the custody defendants are entitled to qualified immunity.

23

24   CONCLUSION

25           For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

26           IT IS SO ORDERED.

27

28   Dated:   May 30, 2007                                    _____

Marilyn Hall Patel
United States District Judge
Northern District of California

**ENDNOTES**

1.  Additionally, plaintiff's expert offered no opinions as to the effect of the policies and practices in effect at Pelican Bay systemwide, stating that he could "opine only on what happened to inmate Lopez, as opposed to what happened systemwide at Pelican Bay." Defs.' Exh. F, Paris Dep. at 171:23–172:2; 200:19–201:6.  However, in light of plaintiff's expert report, this statement appears to indicate that plaintiff's expert was unable to opine on the effects of the policies on other inmates. The expert's overall analysis indicates that the policies and practices in place were inadequate and created a situation which led to plaintiff contracting an MRSA infection.  See generally Pl.'s Exh. 18.

2.  In January 2003, experts retained by a special master appointed by the Northern District stated that the draft policy set forth in this memorandum was "more restrictive than would be necessary to meet community standards of treatment and to assure the safety of staff and inmates," and further concluded that infirmary admission "is only necessary in those cases in which there is excessive drainage causing saturation of the dressing and/or the patient is non-compliant in keeping the wound completely bandaged." Defs.' Exh. CC.  The special master adopted these findings by the expert. Defs.' Exh. DD.  Although plaintiff asserts that these after-the-fact determinations have no bearing on the time period in question, the conclusions by the expert and the special master lend support to defendants' claim that Winslow's response to the MRSA threat at Pelican Bay was reasonable.

3.  Defendants' argument that the right to be free from MRSA infection was not clearly established in 2002 is inapplicable.  The right at issue was to be free from unreasonable exposure to infectious diseases.

27